UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____

WILLIE JARVIS,  :
 :
      Plaintiff,  :    Civ. No. 14-7766 (FLW) (DEA)
 :
v.  :
 :
KEVIN CONWAY et al.,  :    **OPINION**
 :
      Defendants.  :
_____ :

**WOLFSON, Chief Judge:**

## I.    INTRODUCTION

Plaintiff, Willie Jarvis ("Jarvis" or "Plaintiff"), is proceeding *pro se* with a complaint alleging civil rights violations under 42 U.S.C. § 1983. (2d Am. Compl., ECF No. 34.) Presently before the Court is a motion by defendants, Kevin Conway ("Conway") and Vincent Monaghan ("Monaghan") (collectively, "Defendants"), for summary judgment under Federal Rule of Civil Procedure 56. (Mot., ECF No. 85.) For the following reasons, the motion is GRANTED.

## II.    BACKGROUND

### A.  Underlying Facts[1]

As the underlying allegations are well known to the parties, I include here only the undisputed facts as directly relevant to Jarvis's active claims. On the evening of July 11, 2014, at around 11:00 p.m., non-party Lamont Sterling ("Sterling") reported to the New Brunswick

---

[1] The summary judgment motion includes, as required by Local Civil Rule 56.1, a statement of undisputed facts. (Statement of Undisputed Facts, ECF No. 85-2 at 3–10.) Jarvis's opposition to the motion includes a series of admissions and denials, which the Court construes as his responsive statement of material facts, under Rule 56.1. (*See* ECF No. 89 at ECF pp. 2–6.)

Police Department that four men, two of whom had guns, had tried to kidnap and rob him. (Statement of Undisputed Facts, ECF No. 85-2 at 3–10, ¶ 2 [hereinafter, "Defs.' Stmt."]; *see also* Pl.'s Disputed Facts, ECF No. 89, at ECF pp. 2–6, ¶ 2 [hereinafter, "Pl.'s Stmt."].) Sterling reported that his assailants had fled towards a liquor store near his residence, Hub Liquors. (Defs.' Stmt. ¶ 3; *see also* Pl.'s Stmt. ¶ 3.) Officers Henry Gliottone ("Gliottone") and Erika DiMarcello ("DiMarcello") responded to Sterling's home, where he explained to the officers that four men, two with guns, had encountered him near Hub Liquors and had ordered him to take them to his apartment, threatening to shoot him if he attempted to escape. (Defs.' Stmt. ¶ 4; *see also* Pl.'s Stmt. ¶ 4.) Once in the building, Sterling had apparently entered a neighbor's apartment and closed the door on the other men, who had then left.[2] (Defs.' Stmt. ¶ 4; *see also* Pl.'s Stmt. ¶ 4.) Sterling described the assailants as four black, Jamaican men who were wearing jeans and t-shirts, one of whom had dreadlocks, and Gliottone distributed that description as well as the possible location of Hub Liquors over police radio. (Defs.' Stmt. ¶ 5; *see also* Pl.'s Stmt. ¶ 5.)

Defendants, both also New Brunswick police officers, responded to the area of Hub Liquors and saw Jarvis, who "matched the description of the suspect with dreadlocks that had been broadcast over the radio." (Defs.' Stmt. ¶¶ 6–7; *see also* Pl.'s Stmt. ¶¶ 6–7.) Defendants

---

[2] Jarvis, in opposition, urges that it was, in fact, Sterling who committed a crime against Jarvis. He alleges that Sterling had invited Jarvis to come to his residence so that Sterling could sell him $20 worth of marijuana. Jarvis asserts that, once they had entered the building, Sterling exclaimed "You got!," which Jarvis states meant he was being robbed, and Sterling then ducked into another resident's apartment to escape Jarvis. Jarvis admits that he stuck his foot in the door in an attempt to prevent Sterling from getting away but took his foot out of the door when the resident of that apartment yelled at him. (Pl.'s Stmt. ¶ 4.) Jarvis further explains that he pleaded guilty to attempted burglary because of sticking his foot in the other resident's door, and he "admits that he was wrong for sticking his foot in the lady's door." (ECF No. 89 at ECF p. 15.) Importantly, however, Jarvis makes no argument concerning Sterling's allegations to police that Jarvis and others had assailed him. (*See* ECF No. 89.)

detained Jarvis and frisked him. (Defs.' Stmt. ¶ 8; *see also* Pl.'s Stmt. ¶ 8.) Gliottone and DiMarcello then brought Sterling to Hub Liquors and conducted a "show-up" of Jarvis. (Defs.' Stmt. ¶ 10; Pl.'s Stmt. ¶ 10.) Sterling identified Jarvis to officers as one of the assailants who had had a gun. (Defs.' Stmt. ¶ 11; *see also* Pl.'s Stmt. ¶ 11.) Jarvis was then placed under arrest. (Defs.' Stmt. ¶ 11; *see also* Pl.'s Stmt. ¶ 11.)

Jarvis was subsequently charged with kidnapping, possession of a firearm for an unlawful purpose, possession of an unpermitted handgun, terroristic threats, possession of a weapon by a felon, and refusing to allow fingerprints to be taken. (Defs.' Stmt. ¶ 12; Pl.'s Stmt. ¶ 12.) He was indicted on charges of kidnapping, conspiracy, attempted burglary, possession of a weapon for unlawful purposes, possession of an unpermitted handgun, terroristic threats, obstruction, and possession of a weapon by a felon. (Defs.' Stmt. ¶ 20; Pl.'s Stmt. ¶ 20.) Jarvis ultimately pleaded guilty to burglary and attempt, and he was sentenced to three years in prison. (Defs.' Stmt. ¶ 21; Pl.'s Stmt. ¶ 21.)

### B. Procedural History

On October 8, 2014, Jarvis filed a Complaint against the New Brunswick Police Department, Gliottone, and Middlesex Adult Corrections, in the Superior Court of New Jersey, Middlesex County, which Complaint was, apparently, never served. (*See* Notice of Removal, ECF No. 1, ¶¶ 1–2; Notice of Removal, Ex. A, ECF No. 1-1, at ECF pp. 1–6.) Plaintiff then filed a First Amended Complaint in state court on November 6, 2014. (*See id.* ¶ 3; Notice of Removal, Ex. B, ECF No. 1-1, at ECF pp. 7–19.) The First Amended Complaint added as defendants DiMarcello, Judge Philip Barow ("Barow"), Middlesex Adult Correctional Center Warden Mark Cranston ("Cranston"), County Councilor Ronald Rios ("Rios"), and Police

Director Anthony Caputo ("Caputo"). (*See* ECF No. 1-1 at ECF p. 12.) On December 12, 2014, the defendants removed the action to this Court. (*See* ECF No. 1.)

On June 22, 2015, Jarvis, with leave of the Court, filed a Second Amended Complaint, portions of which remain the operative pleading in this action. (*See* ECF Nos. 18, 27, 34.) The Second Amended Complaint alleged claims arising from his arrest and prosecution against Gliottone, DiMarcello, Barow, Caputo, Cranston, Conway, Monaghan, and Rios for unlawful search and seizure, false arrest, false imprisonment, failure to provide *Miranda* warnings, failure to bring Jarvis before a neutral magistrate, failure to intervene, and supervisory liability or failure to train. (*See* ECF No. 34.) The Court granted, on August 7, 2015, a motion by Barow to dismiss the claims against him as barred by judicial immunity. (*See* ECF Nos. 5, 41, & 42.) On September 21, 2015, Magistrate Judge Douglas E. Arpert stayed the action pending the conclusion of the state criminal proceedings against Jarvis. (Order, ECF No. 49.) The action was reopened on March 10, 2017, after the Court was informed of Jarvis's guilty plea and the conclusion of the criminal proceedings. (*See* ECF No. 64.)

Thereafter, the defendants filed motions to dismiss the Second Amended Complaint, (ECF Nos. 65, 66, & 67), which I interpreted as motions for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), as the defendants had previously filed answers, (*see* Op., ECF No. 68, at 5.) I declined to dismiss the Fourth Amendment claims as barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), finding that, because the claims "do not automatically impugn the validity of a subsequent conviction arising from that arrest, the Court is unable to determine whether Plaintiff's success on his Fourth Amendment claims would necessarily impugn the validity of his guilty plea for Burglary and Attempt without the full record." (ECF No. 68 at 12 (citation omitted).) Nonetheless, I granted dismissal as to Cranston and Rios, as Jarvis had

4

included no factual allegations suggesting that either of them was personally involved in any constitutional violations. (*Id.* at 12–13.) Furthermore, pursuant to the Court's screening power under 28 U.S.C. § 1915A, I dismissed the claims related to the alleged failure to bring Jarvis before a neutral magistrate for a probable cause determination within 48 hours of his arrest and the claims against Caputo. (*Id.* at 13–16.) The only claims remaining active following the issuance of that Opinion and Order are the Fourth Amendment claims—for unlawful search and seizure, false arrest, and false imprisonment—against Conway and Monaghan, and the other defendants were dismissed. (*See* ECF No. 68 at 16 & n.12; ECF No. 69 at 2 & n.1.)

The remaining parties thereafter participated in discovery overseen by Judge Arpert. (*See* ECF Nos. 75 & 94.) Upon the conclusion of fact discovery, Defendants moved for summary judgment as to the remaining claims. (ECF No. 85.) Jarvis filed an opposition to the motion, and Defendants filed a reply brief. (ECF Nos. 89 & 92.) Concurrently, Jarvis filed a motion to strike Defendants' Answer based on lengthy delays in their compliance with discovery obligations. (*See* ECF Nos. 88 & 91.) Judge Arpert denied the application to strike the Answer, but, given the discovery delays, granted Jarvis leave to file a supplemental opposition to the summary judgment motion. (ECF No. 94.) Jarvis thereafter filed a supplemental opposition, and Defendants filed a sur-reply. (ECF Nos. 97 & 98.)

### III. LEGAL STANDARDS

#### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56 permits a court to award a party summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if supported by evidence such that a reasonable jury could return a verdict in the non-movant's

favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 251–52 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Kaucher v. County of Bucks*, 455 F.3d 418, 422–23 (3d Cir. 2006). A fact is material if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. *See Anderson*, 477 U.S. at 248; *Kaucher*, 455 F.3d at 423. In determining whether a genuine dispute of material fact exists, the Court must view the facts and all reasonable inferences drawn from those facts "in the light most favorable to the [non-movant]." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

A movant for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). While a defendant moving for summary judgment must support assertions by "citing to particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1)(A), the movant is not required to "support its motion with affidavits or other similar materials *negating* the opponent's claim," *Celotex Corp.*, 477 U.S. at 323. Instead, "the burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. If the movant has shown an absence of material factual dispute, the non-movant then bears the burden to "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). Moreover, the non-movant may not rest upon the mere allegations or denials of the pleadings. *Id.* at 324; *Maidenbaum v. Bally's Park Place, Inc.*, 870 F. Supp. 1254, 1258 (D.N.J. 1994), *aff'd* 67 F.3d 291 (3d Cir. 1995). The non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. A mere "scintilla of evidence . . . will be insufficient." *Anderson*, 477 U.S. at 252.


Local Civil Rule 56.1 requires that a motion seeking summary judgment include a statement of material facts not in dispute and that an opponent of summary judgment shall file "a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion." L. Civ. R. 56.1(a). The rule further provides that "any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion." *Id.* Although a motion for summary judgment may not be granted by default, merely because it goes unopposed, *Anchorage Assocs. v. V.I. Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990), the motion may be granted if the undisputed facts warrant judgment as a matter of law, *Miller v. Ashcroft*, 76 F. App'x 457, 462 (3d Cir. 2003); *Houston v. Township of Randolph*, 934 F. Supp. 2d 711, 723 (D.N.J. 2013), *aff'd* 559 F. App'x 139 (3d Cir. 2014).

### B. Section 1983 Generally

42 U.S.C. § 1983 is the statutory basis for asserting violations of a plaintiff's constitutional rights. That section provides,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States, and second, that the alleged

7

deprivation was committed or caused by a person acting under color of state law. *See Harvey v. Plains Twp. Police Dep't*, 635 F.3d 606, 609 (3d Cir. 2011); *see also West v. Atkins*, 487 U.S. 42, 48 (1988).

## IV. ANALYSIS

### A. Unlawful Seizure, False Arrest, and False Imprisonment

I have construed the remaining portions of the Second Amended Complaint as asserting § 1983 claims against Defendants for unlawful search and seizure, false arrest, and false imprisonment, under the Fourth Amendment. The Fourth Amendment of the Constitution of the United States guarantees a right to be free from unreasonable seizures. U.S. Const. amend. IV. A seizure occurs when a government official restrains a person's freedom of movement such that the person is deprived of his or her free will to leave. *Brendlin v. California*, 551 U.S. 249, 254 (2007). A seizure is generally permissible only if it is supported by probable cause to believe the person has committed a crime. *Bailey v. United States*, 568 U.S. 186, 192 (2013).

A claim for false arrest thus requires that the plaintiff show (1) an arrest and (2) that the arrest was made without probable cause. *James v. City of Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012). The probable-cause inquiry is an objective one: "an arresting officer's state of mind (except for the facts that he knows) is irrelevant" and probable cause for an arrest will be found "as long as the circumstances, viewed objectively, justify that action." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (internal quotation marks omitted).

Fourth Amendment rights may also be implicated by investigatory—or "*Terry*"—stops, which do not rise to the level of an arrest. *See Terry v. Ohio*, 392 U.S. 1, 28–30 (1968); *see also United States v. Cortez*, 449 U.S. 411, 417 (1981). An interaction may constitute a *Terry* stop when, "'taking into account all of the circumstances surrounding the encounter, the police

8

conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Kaupp v. Texas*, 538 U.S. 626, 629 (2003) (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)). A *Terry* stop must be justified by a reasonable suspicion based on an objective sign that a person is, was, or is about to be, committing a crime. *See Cortez*, 449 U.S. at 417 & n.2. "The test is one of reasonableness given the totality of the circumstances, which can include [the suspect's] location, a history of crime in the area, [the suspect's] nervous behavior and evasiveness, and [the officer's] 'commonsense judgments and inferences about human behavior.'" *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000)); *see also United States v. Thompson*, 772 F.3d 752, 758 (3d Cir. 2014). "To meet the reasonable suspicion standard, an officer needs only 'a minimal level of objective justification.'" *United States v. Foster*, 891 F.3d 93, 104 (3d Cir. 2018) (quoting *Wardlow*, 528 U.S. at 123)). In examining this question, a court must consider only the facts known to the officer at the time of the stop. *See United States v. Lowe*, 791 F.3d 424, 430 (3d Cir. 2015).

Reasonable suspicion may be based on what the officer observes firsthand or upon reliable information provided by another person. *See Adams v. Williams*, 407 U.S. 143, 147 (1972). If an officer relies on information from a third party to justify a *Terry* stop, the reliability of that information is assessed under factors identified by the Third Circuit in *United States v. Torres*, 534 F.3d 207, 210–11 (3d Cir. 2008). Under *Torres*, the reliability of third-party information may be bolstered based upon certain indicators:

> (1) The tip information was relayed from the informant to the officer in a face-to-face interaction such that the officer had an opportunity to appraise the witness's credibility through observation.

9

(2) The person providing the tip can be held responsible if her allegations turn out to be fabricated.

(3) The content of the tip is not information that would be available to any observer.

(4) The person providing the information has recently witnessed the alleged criminal activity.

(5) The tip predicts what will follow, as this provides police the means to test the informant's knowledge or credibility.

*Id.* at 211 (internal ellipsis omitted).

Here, Jarvis's encounter with police may be broken into two distinct seizures: his initial detention when Defendants located him near Hub Liquors and his subsequent arrest after Sterling had identified him as one of the assailants. The relevant undisputed facts relevant to the initial detention are as follows:

1. Sterling reported to the New Brunswick Police Department that four men, two of whom had guns, had tried to kidnap and rob him. (Defs.' Stmt. ¶ 2; *see also* Pl.'s Stmt. ¶ 2 (not disputing that Sterling had made such a report to the police).)

2. Sterling reported that his assailants had fled towards Hub Liquors. (Defs.' Stmt. ¶ 3; *see also* Pl.'s Stmt. ¶ 3 (not disputing that Sterling had reported such to police).)

3. Sterling told Gliottone and DiMarcello that four men, two with guns, had encountered him near Hub Liquors and had ordered him to take them to his apartment, threatening to shoot him if he attempted to escape.[3] (Defs.' Stmt. ¶ 4; *see also* Pl.'s Stmt. ¶ 4 (not disputing that Sterling made such allegations).)

---

[3] As noted above, Jarvis contends that what Sterling reported did not happen and that it was, in fact, Sterling who stole money from Jarvis. (*See* Defs.' Stmt. ¶ 4.) Jarvis does not, however, dispute Defendants' representations as to what Sterling reported to police that night. (*See id.*)

10

4. Sterling described the assailants as four black, Jamaican men who were wearing jeans and t-shirts, one of whom had dreadlocks, and Gliottone distributed that description as well as the possible location of Hub Liquors over police radio. (Defs.' Stmt. ¶ 5; *see also* Pl.'s Stmt. ¶ 5 (not disputing that Sterling provided such a description or that Gliottone broadcast it over police radio).)

5. Defendants saw Jarvis, who matched the broadcast description of the suspect with dreadlocks, in the area of Hub Liquors. (Defs.' Stmt. ¶¶ 6–7; *see also* Pl.'s Stmt. ¶¶ 6–7 (seemingly acknowledging that Sterling gave police "an exact description" of Jarvis)).

6. Defendants detained Jarvis while Gliottone and DiMarcello brought Sterling to Hub Liquors to conduct a show-up. (Defs.' Stmt. ¶¶ 8, 10; *see also* Pl.'s Stmt. ¶¶ 8, 10.)

While Jarvis argues that the alleged crime against Sterling never occurred and contests Defendants' assertions that he was struggling and belligerent while he was detained, he does not raise any factual questions with regard to what Sterling told police officers. (*See* ECF No. 89.)

Based on these facts, I conclude that Defendants had reasonable suspicion to conduct an investigatory stop of Jarvis. Defendants had received information from other police officers that a person had reported being assailed by four men, two of whom were armed. Defendants had heard a description of the alleged assailants and their potential location broadcast over the police radio. Defendants had then reported to that location, and saw Jarvis, who matched the description provided of one of the armed assailants.[4] Although this information stems from a tip

---

[4] Indeed, regardless of whether Jarvis committed a crime against Sterling that night, or if, instead, Jarvis was the victim of a crime committed by Sterling, it appears uncontested that Sterling did, in fact, provide police a description of Jarvis. Thus, Jarvis does not make any argument that his detention was unwarranted because he did not match the description provided to police.

from a third party, the information provided by Sterling to police satisfies at least the first four of the *Torres* factors: Sterling reported the incident and described his assailants face-to-face with Gliottone, who then relayed this information to other officers; the police knew who Sterling was and where he lived, and could have held him accountable if he had made false allegations; the incident allegedly involving Jarvis would not necessarily have been obvious to any observer; and Sterling was alleging very recent criminal activity of which he claimed he was victim. *See Torres*, 534 F.3d at 211. An investigatory stop is clearly warranted when a police officer encounters a person who matches the seemingly reliable description of a reported armed criminal in an area where the suspect is likely to be found. *See*, *e.g.*, *United States v. Lawrence*, 327 F. App'x 378, 379–80 (3d Cir. 2009); *United States v. Valentine*, 232 F.3d 350, 354–57 (3d Cir. 2000).

Jarvis's arguments that he did not commit any crime against Sterling, and was, in fact, the victim of a theft committed by Sterling, is simply not relevant to the analysis of whether Defendants had adequate reasonable suspicion to detain Jarvis at the time they did. Jarvis does not contest any of the allegations Sterling made to police, and, indeed, seems to acknowledge that Sterling made these reports. Although Jarvis argues that Sterling's reports were lies, he provides no reason why police officers should have found Sterling lacking in credibility at that time. (*See* ECF No. 89.) The question before the Court is not whether Jarvis committed the crimes of which he was accused, but, considering the totality of the circumstances, whether Defendants, based on the information they had received, had "a minimal level of objective justification" to detain Jarvis for the purposes of their investigation. *See Foster*, 891 F.3d at 104. Similarly, Jarvis's argument that he was not engaged in any suspicious activity at the time Defendants encountered him is not determinative, as reasonable suspicion may properly arise

from information obtained from other sources, not merely from activity witnessed firsthand by officers. *See Adams*, 407 U.S. at 147.

I note that Jarvis repeatedly stresses that Defendants almost immediately handcuffed him despite the fact that their frisk revealed no weapon and that they did not inform Jarvis that he was being detained for the purposes of a show-up. (*See* ECF No. 89 at ECF pp. 4–5, 14–15; ECF No. 97 at ECF p. 2.) To the extent that Jarvis intends to argue that his detention should be considered an arrest, requiring a showing of probable cause, rather than an investigatory stop justifiable merely by reasonable suspicion, such an argument is unavailing. While Jarvis emphasizes that Defendants made it clear that he was not free to leave, and even used force to restrain him, it is well-established that "a *Terry* stop is a seizure, and one seized is by definition not free to leave." *United States v. Edwards*, 53 F.3d 616, 620 (3d Cir. 1995). As Jarvis was properly seized, Defendants had no obligation, as Jarvis suggests, to "giv[e] the Plaintiff the opportunity to walk away or ignore the false accusations." (*See* ECF No. 97 at ECF p. 2.)

Furthermore, "an officer may use intimidation and brief physical restraint without necessarily transforming the encounter into an arrest." *United States v. King*, ___ F. App'x ___, 2019 WL 1467994, at *3 (3d Cir. Apr. 2, 2019). Thus, neither Defendants making clear to Jarvis that he was not free to leave nor their handcuffing of him converted the detention to an arrest. *See Baker v. Monroe Township*, 50 F.3d 1186, 1193 (3d Cir. 1995) ("There is no per se rule that pointing guns at people, *or handcuffing them*, constitutes an arrest." (emphasis added)). In considering whether a seizure is an arrest or a mere investigatory stop, courts may consider "the duration of the stop, the law enforcement purposes justifying the stop, whether the police diligently sought to carry out those purposes given the circumstances, and alternative means by which the police could have served their purposes." *United States v. Leal*, 235 F. App'x 937,

13

941 (3d Cir. 2007). Here, Jarvis's brief detention[5] by Defendants while they waited for Sterling to come for a show-up did not rise to the level of an arrest, despite the fact that Jarvis may have been handcuffed during that period. Although Jarvis argues that Defendants did not *inform* him that they were detaining him for the purposes of a show-up, there appears to be no dispute that Defendants in fact detained Jarvis for that purpose (whether or not it may have gone unspoken) and quickly brought Sterling to conduct a show-up, after which Jarvis was formally placed under arrest. Thus, Jarvis's initial seizure, prior to his formal arrest, was both short and directly related to the investigatory purpose of conducting a show-up.

To the extent that Jarvis also challenges his formal arrest after he had been identified by Sterling, that claim also fails. Similar to his argument regarding the initial seizure, Jarvis's main contention is simply that Sterling's allegations against him were false and that it was, in fact, Sterling who had committed a crime against him. (*See* ECF No. 89.) This argument is irrelevant to the inquiry of whether Defendants had probable cause to arrest Jarvis at that time. "Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995); *see also Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir. 2000). Jarvis contends that "there was no physical evidence or video surveillance in the possession of the Defendants at the time of the arrest to corroborate that such a crime took place," but probable cause can arise from reliable information obtained from a third party, particularly if obtained from the victim of a crime. *See Dempsey v. Bucknell Univ.*, 834 F.3d 457, 477–78 (3d Cir. 2016)

---

[5] In his Second Amended Complaint, Jarvis asserts that, after he was frisked, he was "placed in the back seat of a patrol vehicle for about 60 seconds" before the show-up was conducted. (ECF No. 34 at ECF p. 6.)

("[S]tatements of a victim witness are typically sufficient to establish probable cause in the absence of independent exculpatory evidence or substantial evidence of a witness's own unreliability." (internal quotation marks and brackets omitted)); *see also Sharrar v. Felsing*, 128 F.3d 810, 818–19 (3d Cir. 1997) ("When a police officer has received a reliable identification by a victim of his or her attacker, the police have probable cause to arrest."), *abrogated on other grounds by Curley v. Klem*, 499 F.3d 199 (3d Cir. 2007). When Jarvis was placed under arrest, Defendants had received a report from Sterling that he had been assailed at gunpoint by four men, two with guns, and Defendants had then been present for a show-up in which Sterling affirmatively identified Jarvis as one of the assailants. (*See* Defs.' Stmt.; Pl.'s Stmt.) Presented with such information, the officers[6] clearly had probable cause to arrest Jarvis, regardless of whether it could subsequently be shown that Jarvis, in fact, did not commit any crimes against Sterling. Jarvis has presented no argument as to why Sterling's allegations should have been found, at that moment, inherently incredible, or why officers should have rejected them out of hand.

The finding that officers had probable cause to arrest Jarvis also precludes any recovery on a theory of false imprisonment. A false-imprisonment claim requires a showing that (1) the plaintiff was detained, and (2) the detention was unlawful. *James*, 700 F.3d at 682–83. Thus, when a person is arrested without probable cause, a claim for false imprisonment may be asserted as to the detention following that arrest. *See Groman v. Township of Manalapan*, 47 F.3d 628, 636 (3d Cir. 1995); *see also Manuel v. City of Joliet*, 137 S. Ct. 911, 919 (2017). Here, however, while there is no question that Jarvis was detained, it has been established that this

---

[6] There is some ambiguity as to which officer, whether one of the active Defendants or, instead, Gliottone, actually effectuated the arrest of Jarvis. Nonetheless, any of the officers who were present and privy to the information relayed by Sterling would have had grounds to arrest Jarvis, and, thus, the Court need not resolve this question.

detention was pursuant to an arrest with probable cause, and, therefore, was lawful. For all the foregoing reasons, summary judgment is granted as to the claims for unlawful seizure, false arrest, and false imprisonment.

### B. Unlawful Search

I have also construed the Second Amended Complaint as asserting a claim for unlawful search, under the Fourth Amendment. (*See* ECF No. 34.) Jarvis primarily alleges that Defendants immediately frisked him, without notice or consent, and did not locate any weapon. (*See* ECF No. 34 at ECF p. 6; ECF No. 89 at ECF p. 14; ECF No. 97 at ECF p. 2.) Under *Terry*, "a law enforcement officer, for his own protection and safety, may conduct a patdown to find weapons that he reasonably believes or suspects are then in the possession of the person he has accosted." *Ybarra v. Illinois*, 444 U.S. 85, 93 (1979). Like an investigatory detention, a *Terry* frisk may be justified by "point[ing] to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 391 U.S. at 21. Applying this standard, I conclude that the frisk of Jarvis was justified under *Terry*. Sterling had reported that four men had attempted to kidnap or otherwise assail him, and that two of them were armed with guns. When Defendants arrived at Hub Liquors, they saw Jarvis, who matched the description of one of Sterling's allegedly armed assailants. It is irrelevant to the justification for the frisk that Defendants did not actually find Jarvis to be in possession of a gun; the frisk was justified by the fact that they had received seemingly credible allegations that men with guns and criminal intentions, including one who matched Jarvis's description, were in that area. Thus, summary judgment is granted to Defendants on the unlawful search claim.

Defendants additionally argue that a search of Jarvis after he was placed under arrest was justified. (*See* ECF No. 85-2 at 17–18.) As Jarvis has made no mention of the post-arrest search

16

in his Complaint or his filings related to this motion, I do not construe him as asserting a claim arising from such a search. (*See* ECF Nos. 34, 89, 97.) Nonetheless, I note that Defendants correctly assert that a search following his arrest would have been justified as a search pursuant to lawful arrest, under *Michigan v. DeFillippo*, 443 U.S. 31, 35 (1979) ("The fact of a lawful arrest, standing alone, authorizes a search.").

As I conclude that the search and seizures that are the subject of this action were fully justified under controlling law, I need not reach Defendants' arguments that the claims are barred by *Heck* and collateral estoppel or that Defendants are shielded by qualified immunity. (*See* ECF No. 85-2 at 18–30.)

## V. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment, (ECF No. 85), is GRANTED. As there are no other live claims in this action, the case will be CLOSED. An appropriate order follows.

DATED: May 20, 2019
/s/ Freda L. Wolfson
FREDA L. WOLFSON
U.S. Chief District Judge